UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| BRUCE D. SMEESTER, | ) | CIV. 08-5072-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING DECISION OF |
| MICHAEL J. ASTRUE, | ) | COMMISSIONER |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Bruce D. Smeester (Smeester), moves the court for reversal of

the Commissioner of Social Security's (Commissioner) decision denying his

application for disability insurance benefits and supplemental security income

under Titles II and XVI of the Social Security Act.  The Commissioner opposes

the motion.  The court reverses and remands.

## PROCEDURAL BACKGROUND

On November 28, 2005, Smeester filed applications for disability

insurance benefits and supplemental security income alleging disability since

October 1, 2003.  AR 80-82, 719-22.  Smeester's applications were denied

initially and on reconsideration.  AR 56-57, 59-61.  Upon Smeester's request,

Administrative Law Judge James W. Olson (the ALJ) held a hearing on

September 11, 2007.  AR 26.  On September 25, 2007, he issued a decision

finding that Smeester was not disabled within the meaning of the Social Security Act. AR 10-24. The Appeals Council denied Smeester's request for review on June 30, 2008. AR 5-8. This appeal followed.

**FACTUAL BACKGROUND**

Smeester was born on October 3, 1958, making him 45 years old at the alleged onset date and 48 years old at the time of the ALJ's decision. AR 741. Smeester dropped out of school in 12th grade, but attained his GED in 1983. AR 117. Smeester served in the armed forces from 1978 to 1981 and from 1983 to 1986. AR 391. His work experience includes cleaning and making coffee at an air force base, inserting ads in a newspaper, and truck driving. AR 753-54. Smeester has been homeless for most of his adult life. AR 390. At the time of the ALJ's decision, Smeester was living in a residential dormitory operated by Behavior Management Systems (BMS) in Rapid City, South Dakota. AR 740-41.

Smeester's medical records document a history of hip and back pain, depression, and alcohol dependency. Smeester had back surgery at L5-S1 in 2000. AR 546. He also underwent in-patient alcohol treatment at the Tomah Veteran's Administration (VA) Medical Center in Tomah, Wisconsin, from May 17, 2002, through September 8, 2002. AR 222. Smeester was again hospitalized at the Tomah VA hospital from December 12, 2003, through December 15, 2003. AR 220-21. He admitted to drinking at least a 12-pack of

beer and some vodka daily and was placed in the acute psychiatry ward for alcohol detoxification. AR 220. Upon physical examination, Smeester was found to have good range of motion of his upper and lower extremities. AR 220-21. Smeester was discharged on December 15, 2003, and referred to the Substance Abuse Program. AR 221. Smeester completed the Substance Abuse Program on January 16, 2004, and moved into the Veterans Assistance Center. AR 196, 218. He left the Veterans Assistance Center on July 5, 2004, in order to move to South Dakota because he believed he could enter the compensated work therapy (CWT) program at the VA Black Hills Health Care System–Hot Springs Campus. AR 196, 394. When Smeester arrived at the Hot Springs Campus, he was admitted into an inpatient substance abuse treatment program on August 18, 2004. AR 318.

On August 19, 2004, Smeester saw orthopedic surgeon Dr. Gerald R. Herrin for a consultation. AR 546. Smeester reported right hip pain that began about three or four months before the appointment. AR 546. Dr. Herrin observed that Smeester walked with a limp, had no localized tenderness about the hip, but had pain with internal rotation and abduction. AR 546. Dr. Herrin found that Smeester's x-rays were not normal:

> His changes are fairly subtle, but there is early joint space narrowing superiorly. There is an irregularity in the femoral head just at the acetabular margin. It is not sharp like an osteochondral fracture that one might see in aseptic necrosis, but it may indeed be related to that. He has several subchondral cysts and he has a marginal femoral head osteophyte.

AR 546.  Dr. Herrin believed that Smeester had aseptic necrosis or osteoarthritis, but believed the latter was more likely.  AR 546.

On September 3, 2004, Smeester saw PA-C Susan M. Wassenhove.  AR 511–11A.  He complained of significant trouble walking and severe pain in his hip and knee on the right side.  AR 511A.  PA-C Wassenhove noted that an MRI had been performed on August 23, 2004, which showed bilateral avascular necrosis of the femoral heads, with the condition more advanced in the right side than the left side.  AR 511A.

On September 9, 2004, Smeester saw Dr. Herrin again.  AR 505. Dr. Herrin reviewed the MRI and found that it was consistent with aseptic necrosis, with more involvement on the right than on the left.  AR 505. Because his x-rays were virtually normal, Smeester was at Ficat 1 stage of aseptic necrosis.  AR 505.  Dr. Herrin observed that Smeester was "very symptomatic" and walked with a pronounced antalgic gait on the right.  AR 505.  Dr. Herrin referred Smeester to the VA hospital in Minneapolis, Minnesota, to pursue surgical opinions, stating "[i]n spite of his youth, I don't think he is going to be able to tolerate this until he reaches an ideal age for hip arthroplasty.  AR 505.

Smeester was fitted with axillary crutches for assistive ambulation on September 14, 2004.  AR 502.  He told the kinesiotherapist that he was having terrible right hip pain.  AR 502.

On September 22, 2004, PA-C Wassenhove approved Smeester to participate in CWT. AR 492. PA-C Wassenhove indicated that Smeester was capable of lifting 50 pounds, standing for two hours, working for eight hours, operating hand tools or equipment, and negotiating stairs. AR 492. She also found that Smeester was mentally and physically capable of operating woodshop power tools. AR 492.

On November 4, 2004, Smeester saw PA-C Wassenhove, complaining that his pain medications were not controlling his pain. AR 457. He reported that his pain had been gradually increasing for several weeks and was making it difficult for him to walk and sleep. AR 457. PA-C Wassenhove increased Smeester's dosage of morphine. AR 458.

Smeester completed substance abuse treatment at the Hot Springs Campus in November 2004. AR 318. On November 18, 2004, his treatment team requested that he be transferred to the medical team for residential treatment under their care because Smeester was medically unable to participate in CWT and required medical care for severe problems with his right hip and right leg. AR 445. He was not accepted by the medical team. AR 445. Shortly thereafter, Smeester missed his curfew and left the hospital without proper clearance. AR 319, 394. He was discharged irregularly on November 24, 2004. AR 319. Smeester moved to the Cornerstone Rescue Mission in Rapid City. AR 430, 436. At some point, Smeester got into an

altercation with his roommate and left the Cornerstone Rescue Mission and stayed in his car.  AR 398.

Meanwhile, Smeester went to the Minneapolis VA Medical Center in Minneapolis, Minnesota, for an orthopedic consultation with Dr. David C. Fey on November 30, 2004.  AR 266-67.  Smeester complained of right anterolateral groin pain, right buttock pain, and right distral lateral thigh pain.  AR 266.  Smeester reported that he had increased pain with walking and could walk about two blocks without assistance before he had to stop.  AR 266.  Smeester was taking oral morphine and using crutches.  AR 266.  Dr. Fey observed that Smeester was in obvious distress due to his right hip and had difficulty bearing any weight on the right hip due to pain.  AR 266.  Upon examination, Dr. Fey found that Smeester had full extension, flexion to 110 degrees with anterolateral groin pain, 25 degrees of external rotation, and 10 degrees of internal rotation with significant anterolateral groin pain.  AR 266.  Dr. Fey reviewed Smeester's x-rays and found some mild osteophytic spurring about the acetabulum.  AR 266.  He also saw some osteophytic spurring along the lateral femoral head and a "subtle, but obvious[,] area of collapse in the weightbearing portion of his femoral head."  AR 266.  Dr. Fey reported very subtle sclerosis in the superior femoral head.  AR 266.  Dr. Fey diagnosed Smeester with right hip avascular necrosis with some collapse and early degenerative changes.  AR 266.

Dr. Fey characterized Smeester's condition as a "complex, difficult situation." AR 266. He reported, "[h]e is in quite severe pain at this time. He is quite young, and we would like to avoid doing a hip replacement at a young age due to likeliness of having to have a revision or multiple revision hip replacements in the future." AR 266-67. Dr. Fey planned to have a right intraarticular hip injection performed under fluoroscopy in order to buy time and to help Smeester understand the amount of relief he would get with a hip replacement. AR 267. He planned to see Smeester again in four months for a reevaluation. AR 267.[1] He concluded, "it is quite likely that he will have to have a hip replacement at an early age based on his current symptomology." AR 267.

On December 8, 2004, Smeester presented to an urgent care clinic complaining of hip pain and requesting pain medication. AR 436. He reported that his pain was a six out of ten. AR 437. CNP Mardi Hulm prescribed propoxyphene. AR 437. Smeester also obtained a single point cane with the plan of using a more supportive assistive device if the cane did not relieve sufficient weight from his right leg. AR 435.

In early 2005, Smeester attempted to enroll in the CWT-Transitional Residence (TR) program at the VA Black Hills Health Care System–Fort Meade

---

[1] Smeester canceled an appointment scheduled with Dr. Fey for January 6, 2005. AR 265.

Campus.  As part of the program screening process, Smeester met with vocational rehabilitation counselor Jason Chipman on January 14, 2005.  AR 417-29.  Chipman found that Smeester's "past work experiences and current vocational interests are in conflict with his current physical abilities."  AR 424. After reviewing Smeester's strengths, interests, social and family history, and medical complaints, Chipman concluded that Smeester "appears unemployable or marginally employable at this point.  He has no income and is residing at the [Cornerstone Rescue Mission].  [He] appears to have a limited ability to develop and maintain interpersonal relationships."  AR 427.

On February 2, 2005, Smeester began working as an escort through the Fort Meade Campus's incentive therapy program.  AR 416.  He worked about twenty hours per week and was paid $1 per hour for the two weeks he participated in the program.  AR 162.

Smeester saw psychologists John M. Matthias and Christopher J. Elia for an individual assessment and feedback session on February 18, 2005.  AR 410-13.  Drs. Matthias and Elia administered a Beck Depression Inventory, which indicated moderate to severe depression with a propensity toward severity, an SCL-90-R, which indicated serious symptomatology and possibly severe psychopathology across numerous areas of functioning, an FIRO-B, which indicated that Smeester was uncomfortable with social interactions and exhibited a propensity toward isolation, and an MMPI-2, which raised some

doubts about the validity of Smeester's profile.  AR 411-12.  Overall,

Drs. Matthias and Elia found,

> [Smeester] exhibits severe psychopathology that includes
> depression, feelings of worthlessness and inadequacy, hostility,
> and social isolation and distance.  Although there is some
> indication that he may have exaggerated his pathology, his
> aggregate test scores are consistent and suggest serious problems,
> particularly with interpersonal relationships and an inability to
> express himself appropriately without becoming belligerent or
> aggressive. [Smeester] also tends to see himself critically and
> negatively and likely harbors intense feelings of inadequacy and
> self-doubt that exacerbate his constellation of symptoms and
> mental health problems.

AR 412-13.  Drs. Matthias and Elia found that Smeester was a poor candidate

for CWT-TR because of his severe psychopathology and extreme difficulties

with interpersonal relationships, but recommended group psychotherapy and

continued incentive therapy.  AR 413.

On February 22, 2005, Smeester was found wandering around the

grounds of the Fort Meade Campus.  AR 408.  He reported that he drank a pint

of vodka and took several Tylenol and propoxyphene pills.  AR 409.  He was

hospitalized for close observation and detoxification due to suicidal ideation

and polysubstance abuse.  AR 407.  On February 23, 2005, Dr. Myron K.

Meinhardt, staff psychiatrist, saw Smeester and assigned a global assessment

of functioning (GAF) of 50.  AR 399.  Smeester was discharged from the

psychiatric unit on March 2, 2005, and transferred to the Living Skills in

Action (LSIA) in-patient cognitive behavioral therapy program.  AR 374.

On March 8, 2005, Dr. Herrin referred Smeester to Dr. Steven K. Goff for an intra-articular cortisone injection. AR 363. Smeester saw Dr. Goff on March 9, 2005. AR 362. Dr. Goff observed that Smeester had a fairly antalgic gait and limited and painful motion of the right hip. AR 362. Dr. Goff also noted that Smeester's physicians were trying to delay any total hip surgery. AR 362. He administered a right intra-articular hip injection. AR 362.

On March 22, 2005, Smeester left the Fort Meade Campus and drove into Sturgis, South Dakota. AR 351. He consumed alcohol and then returned to the Fort Meade Campus. AR 351. He encountered VA police, and when they spoke to him, he became assaultive. AR 351. Smeester was arrested and taken to the Meade County Jail. AR 350. As a result, he was dismissed from the LSIA program. AR 351. Smeester was sentenced to eight months imprisonment, followed by one year of supervised release, for assault on a federal officer. AR 288, 299.

In January 2006, Smeester was placed on supervised release in a halfway house in Rapid City. On January 4, 2006, he began receiving bi-monthly counseling and case management services through BMS. AR 617-688. On January 31, 2006, Smeester was taken to the Fort Meade Campus and admitted to the inpatient psychiatric unit by Dr. Thomas J. Jewitt. AR 301. Dr. Meinhardt performed an admission psychiatric evaluation on February 1, 2006, and observed that Smeester was using a wheelchair to

ambulate because canes were not allowed in the psychiatric unit. AR 299.
Dr. Meinhardt reported that Smeester felt hopeless, was concerned he would be
taken back to prison for getting angry or making a mistake, and felt like he
might as well kill himself. AR 299. Dr. Meinhardt observed that Smeester
broke into tears quickly, and his posture looked pained. AR 300. Smeester's
mood was depressed with suicidal ruminations. AR 300. Dr. Meinhardt
diagnosed Smeester with major depression and alcohol dependence in
remission, and assigned a GAF of 33. AR 300. Dr. Meinhardt also noted that
Smeester's pain prevented him from sleeping and was not relieved by
propoxyphene. AR 300. He concluded, "[h]e does not appear able to do any
work in [his] present condition." AR 300.

On February 8, 2006, Dr. Meinhardt had a long talk with Smeester about
his refusal to commit to staying sober. AR 287. Dr. Meinhardt concluded that
Smeester's values were very narcissistic and based on gratification of his
addiction. AR 287.

Smeester was discharged on February 9, 2006. AR 285. Dr. Meinhardt
determined that his GAF at discharge was 40. AR 275. The discharge
summary also documents continued hip pain: "[l]ower extremities revealed
great difficulty in ambulation and lifting himself to a walking position. He
requires the assistance of a cane to balance himself like a tripod on his two
legs. He has constant pain in both hips and even more pain when he

ambulates more than 100 feet." AR 276.  Smeester was taken off propoxyphene and put on methadone for pain.  AR 277.  The methadone seemed to be of some use because Smeester appeared more flexible and was able to ambulate better.  AR 277.

Smeester saw Dr. Meinhardt for monthly medication checks from February 2006 through July 2006.  AR 281, 613-14.  In August 2006, Dr. Jewitt took over Smeester's psychiatric care.  AR 613.  Smeester saw Dr. Jewitt for medication checks about every two months.  AR 594, 603, 607, 608, 610, 612-13.

An x-ray of Smeester's hips was performed on September 6, 2006.  AR 584.  The x-ray revealed moderate narrowing of the superior weight-bearing portion of the right hip joint space accompanied by prominent cortical cysts and some marginal spurring.  AR 585.  The x-ray also showed mottled sclerotic changes involving the femoral head including slight flattening and irregularity of the articular cortex in the right hip.  AR 585.  The x-ray showed Smeester's left hip to be within normal limits.  AR 584.

Smeester saw orthopedic surgeon Dr. Albert Howell for a consultation on September 13, 2006.  AR 611.  Dr. Howell reported that Smeester was in a substantial amount of hip pain and used a crutch to help him get around.  AR 611.  Dr. Howell found that Smeester had excellent flexion, internal/external rotation of about 20 to 30 degrees in each way, and abduction to about 30

degrees.  AR 612.  Dr. Howell concluded that Smeester had degenerative arthritis of the right hip with a substantial amount of sclerosis and an area of substantiated regularity of the joint surface and a large punched out lesion.  AR 612.  Dr. Howell referred Smeester to the VA hospital in Sioux Falls, South Dakota, for possible hip replacement surgery.  AR 612.

On November 15, 2006, Smeester was released from the halfway house and moved into residential treatment at BMS in Rapid City.  AR 615.  Shortly after moving into BMS, Smeester applied for disability insurance benefits and supplemental security income.  Several physicians performed assessments of Smeester's residual functional capacity and ability to perform work-related activities in connection with his applications for benefits.

On February 14, 2006, Dr. Frederick Entwistle, a nonexamining state Disability Determination Services (DDS) physician, reviewed Smeester's medical records and concluded that Smeester was capable of occasionally lifting and/or carrying 10 pounds, frequently lifting and/or carrying less than 10 pounds, standing and/or walking for a total of 2 hours in an 8-hour workday, sitting for a total of 6 hours in an 8-hour workday, and unlimited pushing and/or pulling.  AR 166.  Dr. Entwistle found that Smeester could frequently balance, occasionally climb ramps and stairs, stoop, and crouch.  AR 167.  Smeester should never climb ladders, ropes, or scaffolds, kneel, or crawl.  AR 167.  Dr. Entwistle found no manipulative, visual, or communicative

limitations, but concluded that Smeester should avoid even moderate exposure to hazards like machinery and heights. AR 169.

On May 18, 2006, DDS physician Dr. William Keener reviewed Smeester's medical records and Dr. Entwistle's residual functional capacity assessment. AR 173-74. Dr. Keener agreed with all of Dr. Entwistle's findings, except that Dr. Keener found that Smeester requires either a single crutch or cane to stand and/or walk. AR 173.

On May 23, 2006, Dr. Bruce Lipetz, a nonexamining DDS psychologist, reviewed Smeester's medical records and completed a mental residual functional capacity assessment and psychiatric review technique form. AR 175-77A, 178-90A. Dr. Lipetz found that Smeester had moderate limitations in his ability to understand and remember detailed instructions, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. AR 175-76. Dr. Lipetz explained that when Smeester's alcoholism is in remission, he might have some limitation in concentration and in his ability to get along with the public, supervisors, and coworkers. AR 177. But when Smeester is not drinking, his "functioning appears adequate for some work like activity." AR 177. Dr. Lipetz stated that Smeester retains the ability to do

multi-step tasks as long as he is limited from social contact with the public and requires only brief contact with coworkers and supervisors.  AR 177.

Dr. Lipetz considered Smeester's mental impairments and found that Smeester has the following medically determinable impairments: ADHD, major depression, antisocial personality disorder, and behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  AR 179, 181, 185, 186.  Dr. Lipetz found that Smeester had marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration.  AR 188.  Dr. Lipetz found that Smeester's alcoholism was material to his condition.  AR 190.  He explained,

> [i]t is clear that whether drinking or not he does have severe limitations.  When not drinking he appears to retain at least low average intelligence, attention and concentration are somewhat intact, and there is not evidence of psychosis . . . .  His CPP [concentration, persistence, and pace] may be more impaired than found here, though in reviewing the medical evidence, there is not evidence to support any more than a mild limitation in CPP.

AR 190.  Finally, Dr. Lipetz concluded that when Smeester abstains from alcohol use, his "mental functioning is not shown to be so limited as to preclude any sustained work like activities."  AR 190.

Smeester's psychiatrist, Dr. Jewitt, assessed Smeester's ability to do work-related activities with respect to his mental impairments on September 7,

15

2007.  AR 699-701.  Dr. Jewitt found that Smeester had mild restrictions in his ability to remember locations and work-like procedures, understand, remember, and carry out short and simple instructions, and make simple work-related decisions.  AR 699-700.  Dr. Jewitt also found that Smeester had moderate restrictions in his ability to understand, remember, and carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.  AR 699-700.  And Smeester had marked restrictions in his ability to maintain attention and concentration for extended periods, complete a normal workday without interruptions from psychologically based symptoms, and accept instruction and respond appropriately to criticism from supervisors.  AR 699-700.

Dr. Jewitt based his findings on Smeester's clinical history and his own observation of Smeester's ability to tolerate confrontation and disagreement in a treatment setting.  AR 700.  Dr. Jewitt found that Smeester's alcohol abuse contributed to his limitations, but noted that he was currently abstaining from alcohol use while living in a supervised setting.  AR 701.

Finally, Dr. Thomas E. Atkin, a nontreating psychologist, reviewed Smeester's medical records and completed a psychiatric review technique form on September 8, 2007, and assessed Smeester's ability to do work-related activities on September 9, 2007. AR 702-716; AR 716-18. Dr. Atkin found that Smeester had the following medically determinable impairments: major depression, antisocial personality disorder, and behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. AR 705, 709, 710. Dr. Atkin found that independent of Smeester's alcoholism, he had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. AR 712. Further, Dr. Atkin found that without considering the effect of Smeester's alcohol dependence, he had mild limitations in his ability to understand, remember, and carry out simple instructions, make judgments or simple work-related decisions, and respond appropriately to usual work situations and changes in a routine work setting. AR 716-17. Also without considering Smeester's alcohol dependence, Smeester had moderate limitations in his ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with the public, supervisors, and coworkers. AR 716-17.

Taking Smeester's alcoholism into account, however, Dr. Atkin found that Smeester had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and four or more episodes of decompensation of extended duration. AR 712. Dr. Atkin explained that Smeester's alcohol use and dependence significantly increased his work-related limitations. AR 717.

The ALJ held a hearing on Smeester's applications for disability insurance benefits and supplemental security income on September 11, 2007. Smeester, Dr. Atkin, and vocational expert William Tysdal (Tysdal) testified. Smeester testified that he has pain in his lower back that radiates down through his buttocks and his legs. AR 741-42. He also has pain in his right hip. AR 742. Smeester testified that his pain is constant, but that it can get worse if the weather changes or if he overdoes it by walking too much, standing too long, or sitting in one place too long. AR 742-43. He testified that he has two or three days a week where his pain is worse. AR 747. On these days, he spends more time laying in bed, relaxing, and watching television. AR 747. On the four to five better days a week, he can stand 5-10 minutes before he has to sit down, sit 30-45 minutes at a time, and lift 5 pounds. AR 747. The farthest he can walk before he has to stop is two blocks on an even smooth surface and

less than one block on a rough or uneven surface.  AR 747.  He cannot climb stairs.  AR 747.

Smeester testified that he does chores like taking out the garbage, dusting, and sweeping for five to fifteen minutes a day at BMS.  AR 749.  He takes a shower sitting down and wears slip-on shoes because it is difficult for him to put on shoes with shoelaces.  AR 750.

Smeester testified that he was fitted with axillary crutches on September 14, 2004, because he was having trouble walking.  AR 744.  On December 8, 2004, he decided to try using a single point cane, but he was not strong enough to use the cane properly.  AR 744.  So he currently uses a single crutch.  AR 744.  Smeester testified that the single crutch is better than two crutches because he gets "tied up" when using two crutches.  AR 744.  He cannot walk without the crutch.  AR 745.

Smeester testified that he relieves his pain by taking painkillers, namely methadone.  AR 745.  He testified that he asked his physician to raise his dosage, but his physician said he was at the highest dosage already.  AR 745.  Smeester experiences constipation and drowsiness as side effects of the methadone.  AR 746.  Smeester also tries to keep the pressure off his hip by moving from different standing, sitting, and lying positions.  AR 745.  He has to lie down for 30 to 60 minutes every few hours throughout the day.  AR 745.

Smeester testified that his doctors plan to do a hip replacement when he turns 52. AR 743.

Smeester also testified about his mental condition. He testified that he does not have much patience with other people and often "fl[ies] off the handle . . . sort of fast." AR 746. He testified that he worked as a truck driver for 15 years because he could avoid contact with other people in that position. AR 746.

Dr. Atkin testified that Smeester's primary diagnosis was alcohol dependence and that Smeester has depression and anxiety secondary to alcohol abuse and situational factors. AR 739. Dr. Atkin testified that the medical records indicate that Smeester responded to treatment when he was sober and should be able to follow simple work instructions when sober. AR 739. Dr. Atkin testified that Smeester should be limited to only occasional contact with the public and coworkers. AR 739.

The ALJ asked Dr. Atkin about the assessment prepared by Dr. Jewitt (AR 699-701), particularly the three areas in which Dr. Jewitt found that Smeester had marked limitations.[2] Dr. Atkin testified that Smeester's limitations in these areas were marked only if his alcohol abuse was taken into

_____

[2] These areas are (1) the ability to maintain attention and concentration for extended periods, (2) the ability to complete a normal workday without interruptions from psychologically based symptoms, and (3) the ability to accept instructions and respond appropriately to criticism from supervisors. AR 699-700.

account.  AR 740.  That is, Dr. Atkin did not consider Smeester to have marked limitations in these areas unless he was using alcohol.  AR 740.

Finally, Tysdal testified that a younger individual with a GED, Smeester's work history, the capabilities and limitations outlined in Dr. Entwistle's physical residual functional capacity assessment (AR 165-72), the limitations outlined in Dr. Atkin's assessment of Smeester's ability to do work-related activities (AR 716-18), and a limitation of only occasional interaction with the public and coworkers would be able to do sedentary and unskilled work as an addresser, optical goods assembler, or toy stuffer.  AR 756-58.

Tysdal also testified that a person with Smeester's education and work experience who was limited to sitting for 30 to 45 minutes, standing 5 to 10 minutes, walking 2 blocks on flat ground, and lifting 5 pounds; could not climb stairs or stoop; could do very limited bending; and had the psychological limitations outlined in Dr. Jewitt's assessment of Smeester's ability to do work-related activities would be unable to work.  AR 758.  Tysdal explained that limitations in accepting instructions, responding appropriately to criticism from supervisors, and maintaining attention and concentration, combined with limitations on sitting, standing, and lifting would preclude all work.  AR 758.

## ALJ DECISION

On September 25, 2007, the ALJ issued a decision finding that Smeester had not been under a disability within the meaning of the Social Security Act

from October 1, 2003, through the date of his decision. AR 14. The ALJ

outlined the five-step sequential evaluation process for determining whether an

individual is disabled. AR 14-16.[3] At step one, the ALJ found that Smeester

had not engaged in substantial gainful activity since October 1, 2003. AR 16.

At step two, the ALJ found that Smeester has the following severe impairments:

low back pain status post fusion in 2000, avascular necrosis of the right hip

joint, major depression, anti-social personality disorder, and alcohol

dependence. AR 16. At step three, the ALJ concluded that Smeester does not

have an impairment or combination of impairments that meets or medically

equals one of the listed impairments. AR 18. The ALJ considered the opinions

of Dr. Lipetz and Dr. Atkin and concluded that Smeester's mental impairments

do not meet or equal a listed impairment. AR 18-19. With respect to

Smeester's right hip condition, the ALJ reasoned, "[i]n a request for a 'meets

the listing' decision, the claimant's representative made no reference to the

---

[3] "To determine disability, the Commissioner uses the familiar five-step sequential evaluation, [and] determines: (1) whether the claimant is presently engaged in a 'substantial gainful activity'; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform." Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (internal footnote omitted).

claimant's obvious alcoholism (Ex. 8E). The argument was that the claimant met listing 1.02A. While the claimant's right hip is affected by avascular necrosis, it is not accompanied by an inability to ambulate." AR 19-20.

At step four, the ALJ found that Smeester has the residual functional capacity to be able to occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, sit (with normal breaks) for about 6 hours in an 8-hour workday, stand and/or walk (with normal breaks) for at least 2 hours in an 8-hour workday, do unlimited pushing or pulling (including operation of hand and/or foot controls), frequently balance, occasionally climb stairs/ramps, occasionally stoop, and occasionally crouch. AR 20. The ALJ found that Smeester should never kneel, crawl, or climb ladders, ropes, or scaffolds. AR 20. Further, Smeester should avoid even moderate exposure to hazards, such as machinery, heights, etc. AR 20. Smeester should be limited to jobs with simple one- or two-step instructions and have only occasional contact with co-workers, supervisors, and the public. AR 20. But the ALJ found that Smeester does not have any manipulative, visual, or communicative limitations. AR 20. The ALJ concluded that Smeester does not have the residual functional capacity to perform any past relevant work. AR 22.

Finally, at step five, the ALJ found that considering Smeester's age, education, work experience, and residual functional capacity, Smeester is capable of making a successful adjustment to other work that exists in

significant numbers in the national economy, namely sedentary and unskilled jobs like addresser, optical goods assembler, and toy stuffer. AR 23. As a result, the ALJ terminated his analysis at step five and concluded that Smeester was not entitled to disability insurance benefits or supplemental security income. AR 24.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the record supports it as a whole. 42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision. Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo.

24

Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Further, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); see also Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993). The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980). If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

Smeester argues that the ALJ erred in determining that his hip condition does not equal a listed impairment, in failing to give the opinion of Dr. Jewitt controlling weight, and in assessing the credibility of Smeester's testimony.

## I. Determination that Impairment Does Not Meet or Equal Listed Impairment

A claimant may qualify for benefits at step three if he has an impairment or combination of impairments that meets or equals an impairment listed in

the listing of impairments in 20 C.F.R. Part 404, Appendix 1, Subpart P. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990) (emphasis in original). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Id. at 531 (emphasis in original). The burden of proof is on the claimant to establish that his impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

Smeester argues that the ALJ erred in finding that his right hip avascular necrosis does not meet the impairment listed in § 1.02A of Appendix 1. Section 1.02A, major dysfunction of a joint, requires "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" with "[i]nvolvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in

inability to ambulate effectively." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02A.

"Inability to ambulate effectively" is defined in § 1.00B2b:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B2b.

Here, the ALJ's discussion of whether Smeester's right hip condition equals the listing of § 1.02A is limited to a single paragraph. First, the ALJ indicated that counsel for Smeester did not refer to Smeester's "obvious alcoholism" in his request for a decision that Smeester is disabled at step three. AR 19. While an individual may not be awarded benefits for disabilities for which alcoholism or drug addiction is a contributing factor, see 42 U.S.C.

§ 423(d)(2)(C), the fact that Smeester suffers from alcoholism does not preclude a finding that his right hip condition equals a medical listing. Nothing in the record indicates that Smeester's alcohol abuse contributed to his right hip avascular necrosis.

Next the ALJ indicated, "[t]he argument was that the claimant met listing 1.02A. While the claimant's right hip is affected by avascular necrosis, it is not accompanied by an inability to ambulate." AR 19-20. The ALJ applied § 1.02A incorrectly in that he did not determine whether Smeester's right hip pain resulted in an "inability to ambulate *effectively*." See 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02A (emphasis added). While there is substantial evidence in the record supporting the ALJ's conclusion that Smeester's right hip pain does not prevent him from ambulating *at all*, the ALJ did not consider the evidence relating to Smeester's hip pain, medical treatment, and use of crutches and/or a cane to determine whether his hip pain renders him unable to ambulate *effectively*, as required under § 1.02A. Thus, the ALJ incorrectly applied the law in determining whether Smeester was disabled at step three.

The ALJ's insufficient discussion of § 1.02A is not a mere deficiency in opinion-writing technique that has no practical effect on the outcome of the case. See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Indeed, there is evidence in the record that may show that Smeester was disabled at step

three.[4]  With respect to the "inability to ambulate effectively" criteria of § 1.02A,

the evidence shows that Smeester consistently complained of significant

difficulties with walking.  See AR 266, 276, 457, 511A.  Further, Smeester told

Dr. Fey that he could walk about two blocks without assistance before he had

to stop.  AR 266.  This is consistent with his testimony at the hearing, where

he indicated that the farthest he can walk on an even and smooth surface is

two blocks.  AR 747.  Smeester also testified that the farthest he can walk on a

rough or uneven surface is less than one block.  AR 747.  Finally, the evidence

as a whole indicates that Smeester is unable to walk without the use of at least

one crutch or cane.[5]  Smeester began using crutches on September 14, 2004.

---

[4] The ALJ did not discuss whether Smeester's right hip avascular
necrosis meets all of the medical criteria specified in § 1.02A.  In addition to an
inability to ambulate effectively, § 1.02A requires gross anatomical deformity,
chronic joint pain and stiffness with signs of limitation of motion, findings of
joint space narrowing, bony destruction, or ankylosis of the affected joint, and
involvement of a major peripheral weight-bearing joint.  There is some evidence
in the record supporting each criterion.  Dr. Fey's diagnosis of right hip
avascular necrosis with some collapse and early degenerative changes shows
that Smeester had gross anatomical deformity.  See AR 266.  Dr. Fey also
documented chronic pain and limited motion in the right hip.  See AR 266.
Dr. Herrin observed joint space narrowing in Smeester's x-rays.  See AR 546.
Finally, both Dr. Herrin and Dr. Fey reported involvement of the right hip.  See
AR 266, 546.  The ALJ should consider this and other relevant evidence on
remand.

[5] In another part of his opinion, the ALJ cited a record prepared by
Dr. Steven Massopust, a general care physician, on January 13, 2005,
indicating that Smeester had a cane that he used infrequently.  AR 432.
Dr. Massopust's record that Smeester used a cane infrequently is contradicted
by the consistent documentation in the record that Smeester used at least one
crutch or cane to get around.  See AR 601, 606, 611.  Indeed, Dr. Massopust

AR 502.  He testified that he attempted to use a single point cane in December 2004, but he was not strong enough to get around with the cane.  AR 744.  In February 2006, Smeester had to use a wheelchair to get around the psychiatric unit because canes were not allowed in the unit.  AR 299.  At the hearing, Smeester testified that he currently uses a single crutch because he gets "tied up" when using two crutches.  AR 744.  The ALJ did not consider any of this evidence at step three.

Under § 1.00B2b, a nonexclusive list of examples of ineffective ambulation includes "the inability to walk without the use of a walker, two crutches or two canes," and "the inability to walk a block at a reasonable pace on rough or uneven surfaces."  20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B2b(2).  Although the evidence shows that Smeester is able to walk with the use of a single crutch or cane so that he does not fit within the first example of ineffective ambulation, there is evidence in the record suggesting that Smeester is unable to walk one block on rough or uneven surfaces.  Thus, Smeester may fit within one of the examples of ineffective ambulation set out in § 1.00B2b(2).  Because the ALJ did not consider all of the evidence to determine whether Smeester's hip condition meets the criteria in § 1.02A, the ALJ's determination that Smeester is not entitled to benefits at step three is

_____

later indicated that Smeester uses a crutch to walk.  AR 601.  Despite Dr. Massopust's January 13, 2005, entry, the record as a whole shows that Smeester requires a cane or crutch to ambulate.

reversed.  On remand, the ALJ should consider all of the evidence relating to Smeester's right hip avascular necrosis and ability to ambulate and determine whether his condition meets all of the medical criteria specified in § 1.02A.

## II.     Failure to Grant Controlling Weight to Treating Physician's Opinion

Smeester also argues that the ALJ erred in failing to grant controlling weight to Dr. Jewitt's assessment of Smeester's ability to do work-related activities.  A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006).  "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).  An ALJ's decision to discount or disregard the opinion of a treating physician may be upheld where "other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id. (citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).  Even if a treating physician's opinion is not entitled to controlling weight, it is entitled to deference and must be weighed using all of the factors provided in the regulations.  Policy Interpretation Ruling

Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, Soc. Sec. Rul. (SSR) 96-2p (1996).  These factors are: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ must always give good reasons for the weight afforded to a treating physician's evaluation.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Here, Dr. Jewitt was a treating physician.  Under the applicable regulations, a treating source is a physician, psychologist, or other acceptable medical source who provides the claimant with medical treatment or evaluation and who has an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502; 20 C.F.R. § 416.902.  An ongoing treatment relationship exists where the medical evidence establishes that the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)."  20 C.F.R. § 404.1502;  20 C.F.R. § 416.902.

The Commissioner argues that Dr. Jewitt was not a treating source because he saw Smeester only one time in January 2006.  Contrary to the Commissioner's assertion, Smeester also had medication checks with Dr. Jewitt on August 31, 2006, November 1, 2006, December 6, 2006,

February 15, 2007, May 2, 2007, and July 11, 2007. AR 594, 603, 607, 608, 610, 612-13. Because Dr. Jewitt managed Smeester's pain and psychiatric medications, Smeester saw Dr. Jewitt six times in less than one year, and Smeester's appointments with Dr. Jewitt occurred at the interval set by Dr. Jewitt, the court finds that Dr. Jewitt was a treating source within the meaning of the regulations. As a result, his opinion is entitled to controlling weight if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other evidence in the record. See Singh, 222 F.3d at 452. Additionally, the ALJ must give good reasons for the weight afforded to it. Id.

But the ALJ did not state the weight afforded to Dr. Jewitt's opinion or give good reasons for such weight. The ALJ discussed Dr. Jewitt twice in his opinion. First, under the step two analysis, the ALJ noted that Smeester was seen by Dr. Jewitt on January 31, 2006, and Dr. Jewitt found that Smeester was irritable, guarded, and mistrustful. AR 18. Dr. Jewitt also found that Smeester did not accept any responsibility for the incident that led to his conviction of assault on a federal officer and had fairly impaired judgment and insight. AR 18. Second, under the step four analysis, the ALJ outlined Dr. Jewitt's assessment of Smeester's ability to do work-related activities. AR 21.

The ALJ, however, did not state whether he afforded controlling weight to Dr. Jewitt's opinion regarding the nature and severity of Smeester's impairments, whether Dr. Jewitt's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques, or whether Dr. Jewitt's opinion was consistent with the other substantial evidence in the record. The ALJ did not compare Dr. Jewitt's opinion with the opinions of Dr. Lipetz and Dr. Atkin or explain why Dr. Lipetz's and Dr. Atkin's opinions were supported by better or more thorough medical evidence. Further, the ALJ did not discuss the length of Dr. Jewitt's treatment relationship with Smeester, the frequency of examination, the nature and extent of the treatment relationship, the supportability of Dr. Jewitt's opinion, the consistency of Dr. Jewitt's opinion, or Dr. Jewitt's degree of specialization in order to determine the amount of deference to give to Dr. Jewitt's opinion. In short, the ALJ failed to state the weight given to Dr. Jewitt's opinion and failed to give any reasons for the weight or lack of weight afforded to Dr. Jewitt's evaluation. Even though the ALJ implicitly rejected Dr. Jewitt's opinion in finding that Smeester was not disabled at step five, the ALJ erred in failing to provide reasons for the lack of weight afforded to Dr. Jewitt's opinion. <u>See</u> <u>Singh</u>, 222 F.3d at 452. Because the ALJ did not articulate his reasons for rejecting Dr. Jewitt's opinion, the court cannot determine whether the ALJ had good reason to do so. And "[f]ailure to provide good reasons for discrediting a

34

treating physician's opinion is a ground for remand." <u>Hamilton v. Barnhart</u>, 355 F. Supp. 2d 991, 1005 (E.D. Mo. 2005). Thus, the ALJ's decision is reversed and remanded.

## III.    Credibility Determination

Finally, Smeester claims that the ALJ erred in rejecting Smeester's statements concerning the intensity, persistence, and limiting effect of his symptoms. In weighing a claimant's subjective complaints of pain, the ALJ should analyze the factors set out in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Under <u>Polaski</u>, "[t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." <u>Id.</u>; <u>see also</u> <u>Choate v. Barnhart</u>, 457 F.3d 865, 871 (8th Cir. 2006). Additional considerations include the claimant's relevant work history and the absence of objective medical evidence to support the severity of claimant's symptoms. <u>See</u> <u>Choate</u>, 457 F.3d at 871. Without more, lack of objective medical evidence does not support discounting a claimant's subjective complaints. <u>See</u> <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005).

After considering the <u>Polaski</u> factors, the ALJ must make an "express credibility determination." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004). Inconsistencies between the claimant's subjective complaints and the evidence as a whole may warrant an adverse credibility finding. <u>See</u> <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 578 (8th Cir. 2006). The ALJ must, however, state why the record as a whole supports an adverse credibility determination. <u>See</u> <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006). "[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson</u>, 363 F.3d at 738-39. The court "will not disturb the decision of an ALJ who considers, but for good cause discredits, a claimant's complaints of disabling pain." <u>Goff</u>, 421 F.3d at 792 (internal quotation omitted).

Here, at step four, the ALJ listed the <u>Polaski</u> factors, but did not discuss the facts with reference to each factor. <u>See</u> AR 21-21. Rather, after listing the factors, the ALJ noted that Smeester was denied any disability rating by the VA for service connected disability, that PA-C Wassenhove approved Smeester to participate in CWT on September 22, 2004, and that Smeester submitted Dr. Jewitt's assessment of Smeester's ability to perform work-related activity. AR 21. Then the ALJ concluded, "[a]fter considering the evidence of record, the

undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." AR 21. The ALJ outlined Smeester's subjective complaints, found that Smeester does not acknowledge his alcoholism, noted that Smeester takes methadone for pain, found that the medical records do not contain references to muscle atrophy or significant muscle loss, summarized Dr. Entwistle's and Dr. Keener's assessment of Smeester's residual functional capacity, and summarized Dr. Atkin's assessment of Smeester's ability to do work-related activities. AR 21-22.

Although the Eighth Circuit has recognized that the ALJ is not required to discuss each Polaski factor in a methodical fashion as long as the analytical framework is recognized and considered, the court finds the ALJ's analysis insufficient in this case. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). While the ALJ generally set forth the factors to be analyzed under Polaski by citing 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p, the court finds that he did not adequately examine those factors to determine that Smeester was not credible.

The ALJ did not discredit Smeester's testimony that he has constant back and hip pain that worsens if he walks too much, stands too long, or sits in one place too long. AR 742-43. The ALJ also did not discredit Smeester's

testimony that he can only walk two blocks on an even and smooth surface and less than one block on a rough or uneven surface. AR 747. Nor did the ALJ discredit Smeester's testimony that he cannot walk without a crutch. AR 745. Finally, the ALJ did not discredit Smeester's testimony that he can stand 5-10 minutes before he has to sit down, sit 30-45 minutes at a time, and lift only 5 pounds. AR 747.

Beyond his general conclusory statement that Smeester's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely credible, the ALJ did not discuss evidence in the record to indicate that Smeester's allegations were untruthful. The ALJ noted that the VA found that Smeester was not entitled to benefits for a service-related disability but did not explain whether the VA found that Smeester did not suffer from a disability at all, or whether Smeester suffered from a disability that was not service-related. The ALJ also noted that PA-C Wassenhove cleared Smeester to participate in the CWT program on September 22, 2004, but did not explain how this evidence contradicted Smeester's testimony concerning his physical limitations in light of all of the other medical evidence in the record. Finally, the ALJ noted that the medical records do not contain references to muscle atrophy or significant muscle loss, but did not indicate why this lack of evidence undermined Smeester's complains of pain and physical limitations. In all of these instances, the ALJ failed to link the cited evidence to his

credibility analysis, and the court will not articulate a *post hoc* rationalization for the ALJ's decision.  See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962).

The ALJ is expected "to detail the reasons for discrediting the testimony and set forth the inconsistencies found."  Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).  Credibility determinations are primarily within the providence of the ALJ, and should normally not be disturbed if the ALJ seriously considers, but expressly discredits, a claimant's subjective complaints.  In this case, however, the ALJ did not sufficiently detail his credibility finding so that the court could review it.  While "[a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case," Benskin, 830 F.2d at 883, here, the ALJ's opinion regarding the credibility of Smeester's complaints of pain is insufficient for the court to determine whether the ALJ gave consideration to all of the evidence relating to Smeester's subjective complaints, Smeester's relevant work history, and the medical records supporting Smeester's complaints.  Thus, the court cannot perform its duty to ascertain whether the ALJ could properly discount Smeester's testimony as not credible.  See Masterson, 363 F.3d at 738-39.  The credibility finding is therefore reversed. On remand, the ALJ must fully analyze Smeester's subjective allegations of

disability under <u>Polaski</u>, and if he finds Smeester's allegations not to be credible, he should set forth his reasoning and the relevant inconsistencies in the record.

## CONCLUSION

The court finds that the ALJ erred in determining that Smeester's right hip condition does not equal a medical listing, in failing to give good reasons for discounting Dr. Jewitt's opinion, and in failing to conduct a proper analysis of the credibility of Smeester's subjective complaints. Accordingly, it is hereby

ORDERED that the Commissioner's decision denying Smeester's claim for disability insurance benefits under Title II of the Social Security Act is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS FURTHER ORDERED that the Commissioner's decision denying Smeester's claim for supplemental security income under Title XVI of the Social Security Act is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated August 26, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE